IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| **Plaintiff,** | |
| v. | CRIM. NO. 23-125 (RAM) |
| [3] WILFRE REYES-PIMENTEL, | |
| [4] JOHAN TIRADO-AGUEDA, | |
| **Defendants.** | |

## OPINION AND ORDER

RAÚL M. ARIAS-MARXUACH, United States District Judge

Pending before the Court is Defendant Wilfre Reyes-Pimentel's ("Defendant Reyes") *Motion to Suppress* (Docket No. 131), joined by Defendant Johan Tirado-Agueda ("Defendant Tirado") (collectively, "Defendants"). For the reasons set forth below, the *Motion to Suppress* is **DENIED**.

### I.    PROCEDURAL BACKGROUND

On March 30, 2023, a Grand Jury issued a two-count Indictment charging Defendants Reyes and Tirado, alongside four other co-defendants, with one count of conspiracy to possess with intent to distribute five or more kilograms of a controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and one count of possession with intent to distribute five or more kilograms of cocaine, in violation of 21 U.S.C. § 841(a)(1). (Docket No. 28).

On January 15, 2025, Defendant Reyes filed the pending *Motion to Suppress*. (Docket No. 131). Defendant Reyes alleges that on

March 17, 2023, various agents from the Department of Homeland Security (DHS), Customs and Border Protection (CBP), Fajardo Marine Unit (FMU), Marine Interdiction Agents (MIA), and the Puerto Rico Policy Bureau (PRPB) violated Defendant Reyes' Fourth Amendment rights during his arrest at Playa Las Picuas. (Docket Nos. 1-1 and 131 at 1-2). Namely, Defendant Reyes argues that he was trying to go fishing at Las Picuas at the time of his arrest and was not involved in any alleged drug trafficking. (Docket No. 131). He contests the Government's version of his arrest and asserts that: (1) the authorities lacked reasonable suspicion to stop him; (2) there was no probable cause to arrest him; (3) he was arrested without being read his Miranda rights; (4) his car, a Dodge Caliber, was searched without a search warrant; (5) his cell phone was seized without a search or seizure warrant; and (6) a canine search of Mr. Reyes' car was unlawful because there was no investigatory stop to begin with. Id. at 1-2. A supplementary motion and an unsworn statement by Defendant Reyes were submitted on January 21, 2025. (Docket Nos. 136 and 136-1).

Defendant Tirado filed a *Motion for Joinder* on January 16, 2025, which was granted on January 22, 2025. (Docket Nos. 134 and 137). On February 18, 2025, Defendant Tirado submitted an unsworn statement in support of the *Motion to Suppress*. (Docket No. 155). Defendants both requested an evidentiary hearing for the *Motion to Suppress*. (Docket Nos. 131 and 134).

The Government filed a *Response* to the *Motion to Suppress* on March 24, 2025, also requesting an evidentiary hearing on the matter. (Docket No. 179). The Government argues that, as a threshold matter, Defendants lack standing or a reasonable expectation of privacy to seek suppression of evidence collected from the Dodge Caliber. Id. at 4-6. Furthermore, the initial detention of Defendants was justified because: (a) the responding officers had reasonable suspicion of criminal activity; (b) Defendants were subject to a Terry stop, not a warrantless arrest; (c) there was probable cause to arrest Defendants; (d) no warrants were necessary because Defendants consented to the searches of the Dodge Caliber and cell phones; and (e) in any event, the doctrine of inevitable discovery bars suppression. Id. at 6-12. The Government filed a supplemental response on June 10, 2025. (Docket No. 194).

Defendant Reyes filed a further motion requesting an evidentiary hearing on April 28, 2025, which the Court granted the same day. (Docket Nos. 186 and 187). The Court held a suppression hearing on June 11, 16, and 20, 2025. (Docket Nos. 196; 197 and 205). Defendants presented the testimony of Defendant Reyes, who testified only on the issue of standing, and introduced six exhibits. (Docket No. 254 at 2). The Government presented the testimony of six witnesses: (1) CBP Marine Interdiction Agent ("MIA") Lenier Perez-Martinez ("MIA Pérez"); (2) PRPB Officer

Denis Santiago-Cintrón ("Officer Santiago"); (3) Homeland Security Investigation ("HSI") Special Agent ("SA") Angel Ruiz ("SA Ruiz"); (4) retired CBP Task Force Agent ("TFA") Kelvin Nieves ("TFA Nieves"); (5) CBP Supervisory MIA Geffrey Schneeberger ("Supervisory MIA Schneeberger"); and (6) HSI TFA and PRPB Sergeant Ivan Nieves ("Sergeant Nieves"). Id. at 1-2. The Government introduced forty-four exhibits. Id. at 2.

As requested by the parties, transcripts from the hearing were provided after the hearing concluded. (Docket Nos. 198; 203; 206; 207; 209; 213; 226; 231 and 237). On September 2, 2025, Defendant Tirado filed a *Brief in Support* of the *Motion to Suppress*, Defendant Reyes filed a *Post-Hearing Supplemental Briefing on Motion to Suppress*, and the Government filed its *Post-Suppression Hearing Briefing*. (Docket Nos. 252; 253 and 254, respectively).

## II.  FACTUAL FINDINGS

In light of the parties' filings as well as testimony and evidence presented at the June 11 and 16, 2025 suppression hearing, the Court makes the following findings of operative facts:

**A. The Las Picuas area**

1. Las Picuas is a coastal area of Rio Grande covering a four-mile strip of shore and vegetation. Road No. 3 runs through Las Picuas until it forks off, with one point of the fork eventually ending at a beach.

2. The portion of Las Picuas at the end the fork in Road No. 3 (hereafter referred to as "Las Picuas") is relatively remote. Road No. 3 has various houses that have beach access or are adjacent to the beach, some of which are used as rentals or AirBnbs, and parts of the larger four-mile strip are popular among beachgoers.

3. To reach the beach at the end of Las Picuas, one must drive down Road No. 3 until it forks off and turns from asphalt to dirt. The dirt road has many holes and rocks and runs through large amounts of vegetation. Along this dirt road there is trash but no houses. The road eventually terminates at the beach.

4. The beach itself is rocky, shallow, difficult to enter, and full of reefs. Because of this, it is relatively isolated and is not frequented by beachgoers or fishermen. However, it does connect to other areas of Las Picuas that are used more heavily.

5. This beach is a high incidence area known to be used by drug traffickers and human smugglers. For at least the past four years, it has been patrolled by law enforcement every one to two weeks by land or sea.

6. Further out along the nearby coastline is a river mouth on one side, which is used for fishing, and a hotel, near Coco Beach.

**B. The intervention at Las Picuas**

7.  MIA Pérez has spent four years as a marine interdiction
    agent for the CBP and previously worked for the Puerto Rico
    National Guard as a military police officer. He has
    participated in approximately twenty-five to thirty drug
    trafficking interventions, about half of which took place
    by land and four or five of which took place around Las
    Picuas.

8.  Although currently retired, TFA Nieves spent over thirty
    years with the PRPB and had been a task force agent for
    the CBP since 2001, participating in over one hundred drug
    trafficking interventions. Over thirty of these
    interventions involved land-based activity.

9.  Around 11:30 AM on March 17, 2023, PRPB Officer Miguel
    Vélez ("Officer Vélez") called MIA Pérez and told him that
    he had received a call from dispatch about a shipment of
    drugs that was being retrieved around Las Picuas.

10. MIA Pérez immediately informed his supervisor, Supervisory
    MIA Schneeberger.

11. That day, the weather was so rough and hazardous that law
    enforcement was unable to run their normal maritime patrols
    or go to Las Picuas via boat in response to the call.

12. MIA Pérez and PRPB Officer Andrés Vachier ("Officer
    Vachier") got into an unmarked police vehicle, a dark grey

Ford Bronco, and drove towards the area of Las Picuas near the end of Road No. 3.

13. As they drove, a colleague of MIA Pérez called him and told him people were carrying bales in the same part of Las Picuas they were driving to.

14. This information came from photographs taken by an automatic CBP camera in that area on the morning of March 17, 2023, and showed several people walking through the woods carrying bales and burlap sacks. These types of cameras are installed in areas not generally used by the general public where drug shipments are brought ashore and retrieved.

15. The camera had been placed in Las Picuas in a very brushy area that was difficult to get to. It was located there because that area had previously been used as a drop-off point for drugs on the beach, where a land crew would pick up the drugs and transport them within Puerto Rico.

16. While MIA Pérez and Officer Vachier drove to Las Picuas, the photographs were also being circulated in a work group chat, of which MIA Pérez was a member. However, MIA Pérez did not see the photographs before arriving in Las Picuas.

17. Meanwhile, Supervisory MIA Schneeberger contacted TFA Nieves, telling him about the photographs and suspected drug trafficking activity in Las Picuas.

18. TFA Nieves had been on patrol in Naguabo and drove towards Las Picuas in an unmarked police vehicle, a black Jeep Wrangler, accompanied by Task Force Officer Luiz López ("Officer López"). He turned off the car's lights and sirens as he entered the area.

19. TFA Nieves and Officer López arrived at Las Picuas first. As they neared the end of Las Picuas, TFA Nieves observed a white Dodge Caliber with two people inside was behind them, following them down Road No. 3 despite the high speed of the Jeep Wrangler. TFA Nieves warned Officer López of this.

20. As the Dodge Caliber followed the Jeep Wrangler, TFA Nieves radioed asking for backup in Las Picuas, stating he and Officer López would be intervening with persons engaging in drug trafficking in the area.

21. After turning right down the fork in Road No. 3, TFA Nieves continued down the dirt road towards the beach before turning the Jeep Wrangler around to face the exit and parking it. He saw a grey Ford F-150 with two people inside. The truck looked to be leaving the area. He then saw the Dodge Caliber had parked near the Ford F-150.

22. TFA Nieves parked approximately five feet from a white Chevrolet Express van that had two people standing outside of it. These people appeared to be loading fishing

equipment in the Chevrolet Express, leading TFA Nieves to believe they were fishermen.

23. TFA Nieves radioed in to dispatch a second time to report the vehicles and people, as he found it unusual to see so many vehicles in that area on a weekday and suspected they were in the area to pick up an incoming drug shipment.

24. It had taken TFA Nieves approximately three to five minutes to drive the length of Las Picuas.

25. From the angle where the Jeep Wrangler was parked, the Dodge Caliber was visible. The Ford F-150 was parked out-of-view and in reverse on the side of the road. In addition to the Chevrolet Express behind the Jeep Wrangler, there was also a dark-colored Honda Accord.

26. TFA Nieves stated that the Dodge Caliber was parked roughly twenty to twenty-five feet from the Ford F-150 and was positioned with its wheels turned towards the road in a "suspicious" way that suggested it was about to leave the area.

27. TFA Nieves suspected that the Dodge Caliber was being used as an escort for the Ford F-150, which would be used to carry any drugs that were being retrieved at Las Picuas. He suspected this because in his training and experience, there must "always" be an escort vehicle to escort the drug

cargo, and pick-up trucks can carry a greater number of bales of drugs.

28. TFA Nieves requested the dispatch channel be left open for him to communicate with other officers without interruption.

29. At some point after arriving at Las Picuas but before the other officers arrived, TFA Nieves reported over the dispatch channel that shots had been fired in the area. In relevant part, he stated, "shots heard in here 1050. All units 1050 here at the end of Las Picuas." "1050" refers to a dangerous emergency situation and signals that TFA Nieves needed backup quickly.

30. Officer Vachier heard TFA Nieves' report of gunshots in the area and told MIA Pérez. Officer Vachier and MIA Pérez were still driving towards Las Picuas.

31. As MIA Pérez and Officer Vachier drove down Road No. 3, they were behind a marked police car with its lights on, driven by PRPB Officer Vizcarrondo ("Officer Vizcarrondo").

32. At around 12:00PM, the two police cars approached the end of the road. They saw the Dodge Caliber reversing quickly to drive in the opposite direction from the two police vehicles; however, it was blocked by some trees and stopped moving (presumably as TFA Nieves was reversing and parking

his vehicle). Here, the dirt road was narrow enough that
only one car could pass down the road at a time.

33. MIA Pérez believed the Dodge Caliber was part of the
suspected drug trafficking activity that had been reported
to dispatch and was trying to evade the police.

34. Meanwhile, TFA Nieves found it suspicious the people in
the Dodge Caliber did not get out of the car after it
stopped.

35. TFA Nieves approached the Dodge Caliber with his firearm
out and pointed at the two men inside (Defendant Reyes and
Defendant Tirado), in case they were armed.

36. The other two police cars stopped, and MIA Pérez, Officer
Vachier, and Officer Vizcarrondo got out of their cars and
walked towards the Dodge Caliber. They were holding their
firearms in a "low ready" position, at a forty-five degree
angle to the ground.

37. As they approached the Dodge Caliber, TFA Nieves and
Officer Vachier saw the two individuals in the Ford F-150
exit the vehicle and run.

38. The officers told Defendants to get out of the Dodge
Caliber and stand with their hands up. Defendants complied,
and TFA Nieves told them to lie down with their hands on
their heads.

39. TFA Nieves handcuffed Defendants and searched them to make sure they were not carrying firearms or any other weapons on them. He then sat the men upright as Officer Vachier assisted him.

40. Defendants both had dry clothes and did not have contraband or weapons on their persons.

41. Once Defendant Reyes and Defendant Tirado were detained, MIA Pérez approached the Ford F-150. He found the Dodge Caliber and Ford F-150 to be approximately twenty-five to thirty feet apart.

42. MIA Pérez approached the passenger side of the Ford F-150 and observed bales in the truck cabin and an outboard engine on the ground near the truck bed. The door to the truck bed was open and more bales were lying in the bed.

43. Meanwhile, TFA Nieves seized a cell phone from the front seat of the Ford F-150 and walked around to the back of the car, observing various bales in the backseat and truck bed.

44. Based on their training and experience, MIA Pérez and TFA Nieves concluded that the bales contained cocaine, with TFA Nieves estimating the bales contained what would seem to be approximately five hundred kilograms of cocaine.

45. Based on their training and experience, MIA Pérez and TFA Nieves did not believe that drug traffickers would permit

unrelated bystanders to be in the vicinity of the shipment
when it is being sent out, taken in, or otherwise being
actively worked on by the traffickers.

46. TFA Nieves returned to Defendants and asked them if they
had any identification or phones in their possession.

47. TFA Nieves asked for identification to determine who the
men were and whether they have a criminal history or are
legally in Puerto Rico. He asked about their phones as the
phones may contain information about any drug trafficking
organization ("DTO") or retrieval the men may have been
involved in.

48. Defendants told TFA Nieves that their phones and
identification cards were in the Dodge Caliber. They gave
him permission to remove the phones and identification
cards from the vehicle.

49. Inside the Dodge Caliber, TFA Nieves found and retrieved
the men's phones and identification cards from the
Dominican Consulate in Puerto Rico. (*See* Docket No. 220-
1).

50. Meanwhile, after he finished searching the Ford F-150, MIA
Pérez returned to his colleagues and told them he was going
to search along the beach at Las Picuas for other people
that may be running through or hiding in the brush.

51. MIA Pérez and Officer Vizcarrondo walked to the beach area
    and found two people with a small boat with oars that
    lacked a motor. They appeared to be pulling the boat up
    the beach. The officers told the two people to raise their
    hands.

52. The two people said they were going fishing. The officers
    asked if they could search the vessel, and what was inside.
    The two people said they had "no problems with that." The
    officers found no illegal items inside the boat and left
    the two people with their colleagues as they continued
    searching the beach.

53. MIA Pérez then observed an overturned yola in the water
    approximately two hundred meters away, and various motor
    oil and gas containers scattered across the beach. The gas
    containers were similar to those MIA Pérez and his
    colleagues "usually find on yolas when they are bringing
    [drug] shipments from outside in."

54. Also visible on the beach was the Jeep Wrangler used by
    TFA Nieves and the Chevrolet Express that was being used
    by the two individuals found on the beach.

55. All the officers at the scene were wearing their official
    uniforms and carrying firearms. TFA Nieves and Officer
    López were wearing bulletproof vests.

56. MIA Pérez and TFA Nieves had previously carried out drug trafficking interventions in this part of Las Picuas. They both noted that the heavy overgrowth in Las Picuas made it easy for people to hide in the brush, and thus more likely to be dangerous.

57. In their experience, TFA Nieves and MIA Pérez found that the drug traffickers subject to law enforcement interventions, were "usually" carrying weapons to protect their cargo from other DTOs and stationed lookouts in the area to make sure they were not being observed.

58. Both TFA Nieves and MIA Pérez knew of colleagues who had been killed by drug traffickers during an intervention. TFA Nieves had previously been involved in an intervention near Luquillo where a suspected drug trafficker had taken out a rifle to use against law enforcement.

59. MIA Pérez approached these interventions under the mentality that "every time you respond to an area there will always be a weapon in that area."

60. Both TFA Nieves and MIA Pérez indicated their primary concern when responding to an intervention such as that at Las Picuas was their own safety.

**C. Arrival of MIA Schneeberger**

61. Supervisory MIA Schneeberger has worked as a supervisory marine interdiction agent for the last five years, having

previously worked as a marine interdiction agent for another five years. He has been involved in thousands of inspections involving immigration violations and hundreds of inspections involving drug trafficking, approximately 80 to 90 percent of which involved the use of a law enforcement canine.

62. Supervisory MIA Schneeberger arrived later, observing the four vehicles in the area (the Dodge Caliber, Ford F-150, Chevrolet Express, and Honda Accord), and Defendants in handcuffs.

63. Supervisory MIA Schneeberger acknowledged that at this time, Defendants remained handcuffed and were not free to leave the area.

64. By the time Supervisory MIA Schneeberger arrived, he believed HSI was working to determine Defendants' immigration status. He learned their identities through their identification cards.

65. Supervisory MIA Schneeberger received information that Defendant Reyes had a TECS record[1] that stated he was a citizen of the Dominican Republic and part of a DTO. Specifically, the TECS record stated Defendant Reyes

---

[1] A TECS ("Treasury Enforcement Communication System") record is a CBP-HIS record system that records information on individuals.

assisted the DTO by providing logistic support and working as part of a pick-up crew.

66. Supervisory MIA Schneeberger also received information on Defendant Tirado's TECS record, which stated he was a citizen of the Dominican Republic but had arrived in the United States in 2004 and maintained an illegal presence in the country for approximately sixteen years.

67. Supervisory MIA Schneeberger then observed canine officers do a free air sniff around the Dodge Caliber. One dog sat next to the vehicle on the driver's side, which in Supervisory MIA Schneeberger's experience, signals an odor of narcotics.

**D. Defendant Reyes' interactions with law enforcement**

68. Sergeant Nieves is a PRBP police sergeant on detail with the HSI office task force.

69. On March 17, 2023, Sergeant Nieves conducted Defendant Reyes' interview. Defendant Reyes was handcuffed and the two men sat across a desk from each other.

70. After taking down his personal information, Sergeant Nieves confirmed that Defendant Reyes could read and write. He then gave Defendant Reyes a <u>Miranda</u> form, and Defendant Reyes read it. Sergeant Nieves asked Defendant Reyes if he understood the form, and Defendant Reyes responded in the affirmative.

71. Sergeant Nieves then asked Defendant Reyes to initial various segments of the form, along with his last name.

72. When Defendant Reyes reached the waiver portion of the Miranda form, Sergeant Nieves asked Defendant Reyes if he wanted to talk to him, stating that Defendant Reyes had the authority to decide whether to answer, that the decision was free and voluntary, and that if Defendant Reyes wanted to speak further, he should sign the form.

73. Defendant Reyes responded that he had nothing to do with the events in Las Picuas and that he would sign the form. He then signed it in front of Sergeant Nieves and Supervisor Luis Ortíz. Defendant Reyes did not appear confused and did not request an attorney.

74. Officer Santiago is a member of a task force for HSI Fajardo. She is responsible for making sure detainees were okay and offering them food; assisting special agents in processing the detainees through fingerprinting, DNA, and photography; and assisting with consent forms or any documents that may need to be filled out for evidence.

75. On March 17, 2023, Officer Santiago heard about Defendants' detention at Las Picuas over the PRPB radio and was in the office when Defendants were brought in that afternoon.

76. On March 18, 2023, Officer Santiago was responsible for the detainee Defendants.

77. That morning, Officer Santiago offered Defendants breakfast. SA Jackson, the special agent in charge of Defendants' case, then asked her to go to Defendant Reyes and fill out a consent form for Defendant Reyes' cell phone, which was in an evidence bag. SA Jackson gave Officer Santiago Defendant Reyes' cell phone and a copy of the consent form.

78. Officer Santiago and a colleague took Defendant Reyes out of his cell and met with him in the processing area. Neither Officer Santiago or her colleague were armed.

79. Sitting next to him on a bench, Officer Santiago asked Defendant Reyes if the cell phone in the evidence bag was his property. Defendant Reyes said yes.

80. Officer Santiago then told Defendant Reyes that she had a document that, if he signed it, would act as consent to allow the authorities to search Defendant Reyes' phone. Defendant Reyes nodded and verbally said yes. Officer Santiago asked Defendant Reyes if he could read and write, to which he said yes.

81. Officer Santiago read the consent form in Spanish; the form contains the same content in both English and Spanish. She asked Defendant Reyes if he understood, and he said yes. Officer Santiago then gave Defendant Reyes the form, which he filled out and signed.

82. Officer Santiago believed that Defendant Reyes understood the form he was signing and had no issues with his cell phone being searched. He remained calm the entire time and did not express confusion, a desire not to sign the form, or an interest in speaking to an attorney.

83. Officer Santiago did not ask when Defendant Reyes had last spoken to a HSI officer and did not recall which officer had conducted his interview after his arrest.

84. Officer Santiago did not read Defendant Reyes his <u>Miranda</u> rights, stating this was because she was not interrogating him.

85. The consent form is only signed by Defendant Reyes.

86. The consent form does not mention that anything found may be used against Defendant Reyes, that Defendant Reyes has a right to decline to have someone investigate the phone, or that Defendant Reyes has the right to consult an attorney.

**E. Defendant Tirado's interactions with law enforcement**

87. HSI SA Angel Ruiz ("SA Ruiz") was a supporting agent when Defendants were arrested, helping with subject interviews.

88. SA Ruiz led the interview with Defendant Tirado, holding the interview in his office near a cell block area. SA Ruiz was unarmed and sitting across a table from Defendant

Tirado. Mitch Beerly ("Mr. Beerly"), a colleague of SA Ruiz, was also present.

89. During the interview, SA Ruiz asked various biographical questions before explaining his job as an immigration investigator and customs investigator.

90. Throughout the interview, Defendant Tirado asserted that he did not know what had been going on at Las Picuas at the time he was detained by law enforcement.

91. Eventually, SA Ruiz stopped the interview after Defendant Tirado had an "utterance" and asked "what it would take if he wanted to cooperate with [the authorities]."

92. Defendant Tirado's statement was a "red flag" for SA Ruiz because Defendant Tirado was being detained by the federal government and any cooperation with SA Ruiz may result in Defendant Tirado disclosing self-incriminatory or criminal information.

93. SA Ruiz read Defendant Tirado his <u>Miranda</u> rights in Spanish and explained their content to him verbally and in written form in Spanish. SA Ruiz read this information slowly and carefully to Defendant Tirado and asked him several times if he understood, to which Defendant Tirado answered in the affirmative.

94. SA Ruiz confirmed Defendant Tirado could read and write.

Criminal No. 23-125 (RAM)                                              22

95. Defendant Tirado then agreed to speak with the Government and signed his name and signature on the <u>Miranda</u> waiver form, which SA Ruiz and Mr. Beerly also signed.

96. At some point in the interview, Defendant Tirado told SA Ruiz that he had a cell phone that was confiscated when he was detained by police and that he gave the police permission to look at his phone.

97. SA Ruiz asked Defendant Tirado if he still consented for the police to look at his cell phone, and Defendant Tirado answered yes. Throughout the interview, Defendant Tirado verbally consented to allow the Government to search his phone at least three times.

98. SA Ruiz then asked where his phone was and if it had a passcode, to which Defendant Tirado said no.

99. SA Ruiz provided a consent form used by HSI SAs to give consent for the Government to look at the signer's phone.

100. SA Ruiz read and explained the form to Defendant Tirado in Spanish, going back to highlight key points of the form and make sure that Defendant Tirado fully understood what he was signing and was doing so freely and voluntarily.

101. SA Ruiz then filled out the consent form and gave it to Defendant Tirado for him to sign.

102. Defendant Tirado's signature was the only signature on the consent form.

103. The consent form does not mention that anything found may
     be used against Defendant Tirado, that Defendant Tirado
     has a right to decline to have someone investigate the
     phone, or that Defendant Tirado has the right to consult
     an attorney.

**F. Defendant Reyes' connections to the Dodge Caliber**

104. The Dodge Caliber is a 2007 car with the license plate HCT-
     119.

105. On March 17, 2023, the Dodge Caliber was registered to a
     Betty Palmer-Colón and had been registered to her in all
     Department of Transportation and Public Works (abbreviated
     in Spanish as "DTOP") records. (*See* Docket No. 220-2).

106. Defendant Reyes testified that he had purchased the Dodge
     Caliber from a friend for $700.00 cash in a contractless
     sale in October 2022.

107. Defendant Reyes stated he bought no other car during that
     period and did not own a car prior to his purchase of the
     Dodge Caliber.

108. Defendant Reyes claimed he had not registered the car in
     his name because it had mechanical problems and would
     overheat. He did not obtain insurance for the car.

109. Defendant Reyes has no pictures, text, or e-mail records
     to support his ownership of the car and stated that he did
     not feel a need to show off that car.

110. In an October 11, 2022, text message exchange with his girlfriend, Defendant Reyes indicates that he purchased a gray 2004 Honda Accord. Defendant Reyes took pictures of a grey Honda Accord on October 15, 2022.

111. Defendant Reyes had the only set of keys to the car, he did not allow other people to drive it without his authorization, he regularly locked the car to secure it, and he parked the car in front of his residence at night.

112. The Dodge Caliber was involved in an accident sometime before March 17, 2023.

### III. APPLICABLE LAW

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. It provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched." U.S. Const. amend. IV.

The exclusionary rule makes the Fourth Amendment enforceable by prohibiting the fruits of an unreasonable search or seizure from being admitted at trial. *See* United States v. Camacho, 661 F.3d 718, 724 (1st Cir. 2011); *see also* Wong Sun v. United States, 371 U.S. 471, 484-85 (1963) (discussing the "fruits" of unreasonable searches and seizures). When a defendant moves to

suppress evidence under the Fourth Amendment, he has the burden of showing his Fourth Amendment rights were violated. *See* United States v. Rheault, 561 F.3d 55, 58-59 (1st Cir. 2009) (citing Rakas v. Illinois, 439 U.S. 128, 130 n.1 (1978)).

## IV.   DISCUSSION

### A. Defendants were initially detained in a Terry stop

Law enforcement may detain individuals for a brief and warrantless investigatory stop "'based on a reasonable suspicion that criminal activity may be afoot.'" United States v. Rasberry, 882 F.3d 241, 246 (1st Cir. 2018) (quoting United States v. Pontoo, 666 F.3d 20, 27 (1st Cir. 2011)). These detentions are called Terry stops, which do not violate the Fourth Amendment's prohibition on "unreasonable" searches and seizures. United States v. Dapolito, 713 F.3d 141, 147 (1st Cir. 2013) (citation omitted); *see* Terry v. Ohio, 392 U.S. 1 (1968). An individual faces detention by law enforcement "when a reasonable person would not feel free to refuse to answer police questions and proceed along his way." Dapolito, 713 F.3d at 147.

A court evaluating whether a detention constitutes a Terry stop "must consider whether (1) reasonable suspicion justified the stop at its inception, and (2) whether the actions of law enforcement officers during the stop were reasonably related in scope to the circumstances justifying the stop." United States v. Acevedo-Vázquez, 335 F.Supp. 3d 263, 269 (D.P.R. 2018) (citation

omitted). Reasonable suspicion must be grounded in "a particularized and objective basis for suspecting the particular person stopped of criminal activity." Pontoo, 666 F.3d at 27-28 (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)). The reasonable suspicion standard "'defies precise definition' and 'must be determined case by case,'" but is fundamentally a commonsense matter. Dapolito, 713 F.3d at 148 (quoting United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001); citing Ornelas v. United States, 517 U.S. 690, 695 (1996)). It makes "due allowance for police officers to draw upon their experience and arrive at inferences and deductions that may well elude an untrained person." United States v. Trinidad-Nova, 731 F.Supp. 3d 273, 280 (D.P.R. 2024) (internal quotation marks and citation omitted). "The particularity requirement demands that the finding be 'grounded in specific and articulable facts.'" Id. (quoting United States v. Hensley, 469 U.S. 221, 229 (1985)). The "objective basis" of a stop is determined "through the lens of a reasonable police officer," not an officer's subjective view. Dapolito, 713 F.3d at 148 (citation omitted); see Trinidad-Nova, 731 F.Supp. 3d at 280. When reaching its decision, a court should consider the "totality of the circumstances surrounding an encounter." United States v. Romain, 393 F.3d 63, 75 (1st Cir. 2004) (citation omitted).

Should a Terry stop become too intrusive, it morphs into a de facto arrest. Rasberry, 882 F.3d at 247. While there is no bright-

line rule for distinguishing a <u>Terry</u> stop from an arrest, the transition occurs when, under the totality of the circumstances, "a reasonable person in the suspect's position would have understood [his] position to be tantamount to being under arrest." <u>United States v. Fernandez Ruiz</u>, 425 F.Supp. 3d 82, 86 (D.P.R. 2019) (internal quotation marks and citation omitted). Factors include "the location and duration of the stop, the number of police officers present at the scene, the degree of physical restraint placed upon the suspect, and the information conveyed to the suspect," "as well as the surroundings, duration, and character of the interrogation." <u>Id.</u> (citation omitted).

    *i.  Reasonable suspicion justified the initial stop*

    The responding officers at Las Picuas had reasonable suspicion that justified the stop of the Dodge Caliber and Defendants at its inception. *See* <u>Acevedo-Vázquez</u>, 335 F.Supp. 3d at 269. The area to which the officers were responding and where Defendants were stopped is a known drug trafficking area, so much so that multiple drug trafficking interventions had occurred there previously and a CBP camera has been installed there to monitor the area for drug traffickers. Sea conditions had been so hazardous that morning that law enforcement had been unable to reach Las Picuas by boat, which, in conjunction with the isolated nature of this stretch of Las Picuas, made it an unlikely location for recreational fishing or swimming. TFA Nieves had been told about

the photographs captured by the CBP camera before he arrived in Las Picuas, and all the responding officers appear to have known that, as they were responding to the area, suspected drug trafficking activity was occurring there. As they drove to Las Picuas, Officer Vachier and MIA Pérez had heard TFA Nieves' radio calls where he stated that he and his colleague would be intervening with drug traffickers in Las Picuas, reported hearing gunshots in the area *minutes* before Defendants were stopped, and said "1050," a radio code that indicated TFA Nieves was in a dangerous emergency situation and needed backup.

Defendants' behavior in the Dodge Caliber invited further scrutiny and led to TFA Nieves' suspicion that the Dodge Caliber was an escort vehicle and involved in the suspected drug trafficking. The car was observed following TFA Nieves and Officer López as they drove down Road No. 3 before attempting to reverse and leave the area. The Dodge Caliber stopped near the Ford F-150 and was positioned as though it was about to leave the area— and in the officers' eyes, try to evade the police. Defendants did not try to exit the Dodge Caliber after it stopped and had no fishing equipment on their persons. Their behavior contrasts with the individuals standing near the Chevrolet Express— who were loading fishing equipment into the van and did not initially raise TFA Nieves' suspicions. Indeed, the decision to immediately go to the Dodge Caliber and initially leave the Chevrolet Express alone

(which was much closer to TFA Nieves' vehicle) indicates that the officers' decision to stop Defendants was based on individualized suspicion due to their behavior. Contrary to the arguments in the *Motion to Suppress*, the record shows that the officers did not make a blanket decision that every person present in that area of Las Picuas was a suspected drug trafficker solely due to their presence in the area.

At the time Defendants were detained, there was reasonable suspicion to infer that they could be involved in drug trafficking at Las Picuas. *See* Dapolito, 713 F.3d at 148. This decision is informed by the totality of the circumstances, namely Las Picuas' isolated location and status as a known drug trafficking spot not frequented by the public, that morning's poor sea conditions, Defendants' odd behavior on the way to and at Las Picuas, one officer having heard gunshots in the area, and dispatch's report of suspected drug trafficking at Las Picuas approximately thirty minutes before the officers' arrival. *See* Romain, 393 F.3d at 75.

> ii. *Law enforcement actions during the stop were reasonably related to the reasons for the stop*

Law enforcement actions taken during the stop were reasonable because of the conditions under which the officers were responding. *See* Acevedo-Vázquez, 335 F.Supp. 3d at 269. After arriving in Las Picuas, the responding officers left their vehicles and approached the Dodge Caliber in uniform and openly carrying firearms. As they

did, two people got out of the Ford F-150 and ran into the brush. The officers ordered Defendants out of the Dodge Caliber and told them to stand with their hands up; Defendants complied. TFA Nieves then told them to lie down with their hands on their heads before handcuffing them and searching them for firearms or other weapons. He then sat the men upright with Officer Vachier's assistance before turning to investigate the immediate area further.

Testimony at the suppression hearing by TFA Nieves and MIA Pérez indicates that these actions were objectively reasonable in the context of a Terry stop. Both men had years of law enforcement experience and had previously carried out multiple land-based drug trafficking interventions. In their experience, drug traffickers confronted by law enforcement "usually" carried weapons to protect their cargo from other DTOs and stationed members as lookouts. In recent years, drug traffickers have killed law enforcement officers during interventions. TFA Nieves and MIA Pérez acknowledged that their primary concern when engaging in a drug trafficking intervention was to ensure their physical security.

Furthermore, in the minutes before the Terry stop commenced, the officers had been responding to reports of drug trafficking in an isolated area, requiring them to drive down a narrow road surrounded by heavy overgrowth. TFA Nieves had heard gunshots in the area and reported it over the radio alongside a "1050" call, alerting the other officers to a dangerous emergency situation in

the area that required backup. As the officers approached the Dodge Caliber, two other individuals exited the Ford F-150 and fled into the underbrush. This heavy overgrowth would have made it easy to hide from law enforcement, further raising the security risk the officers faced.

As previously stated by the First Circuit, "[t]he connection between drugs and violence is...legendary." Rasberry, 882 F.3d at 248. Here, the officers had entered an isolated area where drug trafficking was suspected, multiple unknown persons were hidden from sight, and gunshots had recently been fired. In light of these circumstances, the Terry stop did not become a *de facto* arrest when Defendants were removed from the Dodge Caliber and handcuffed because the responding officers were acting to secure the area and guarantee their and their colleagues' personal safety. Id. at 247. The First Circuit has long held that law enforcement "engaged in an otherwise lawful stop must be permitted to take measures— including the use of handcuffs— they believe reasonably necessary to protect themselves from harm, or to safeguard the security of others." United States v. Acosta-Colon, 157 F.3d 9, 18 (1st Cir. 1998) (collecting cases). Similarly, officers may order a suspect to the ground in conjunction with handcuffs if officer safety is a legitimate concern. *See* Pontoo, 666 F.3d at 30-31 (discussing appropriate prophylactic measures in the context of Terry stops).

Considering both the context in which the stop occurred and the responding officers' actions, the Court concludes that the officers acted in a way that was reasonably related in scope to the circumstances justifying the stop. *See* Acevedo-Vázquez, 335 F.Supp. 3d at 269. Arriving at a potentially dangerous site where suspected drug trafficking had been reported shortly before, the officers quickly secured Defendants before turning to investigate the nearby area. This constituted a Terry stop, not an arrest.

**B. Law enforcement had probable cause to arrest Defendants**

As previously noted, the Fourth Amendment guards against unreasonable searches and seizures. *See* U.S. Const. amend. IV. Arrests are seizures of persons and must be reasonable under the circumstances. *See* Payton v. New York, 445 U.S. 573, 585 (1980). A warrantless arrest is reasonable under the Fourth Amendment if an officer has probable cause to believe that a crime was committed in his presence. Atwater v. Lago Vista, 532 U.S. 318, 354 (2001). "[P]robable cause exists when an officer, acting upon apparently trustworthy information, reasonably can conclude that a crime has been...committed and that the suspect is implicated in its commission." United States v. Flores, 888 F.3d 537, 543 (1st Cir. 2018) (quoting Morelli v. Webster, 552 F.3d 12, 21 (1st Cir. 2009)).

Probable cause is assessed by evaluating the totality of the circumstances known to the officers at the time of the arrest.

French v. Merrill, 15 F.4th 116, 125 (1st Cir. 2021) (citing
Flores, 888 F.3d at 544). It can be determined based on the
"collective knowledge and information of all the officers
involved." United States v. Paradis, 802 F.2d 553, 557 (1st Cir.
1986) (citing United States v. Rose, 731 F.2d 1337, 1342-43 (8th
Cir.), *cert. denied*, 469 U.S. 931 (1984)). Moreover, probable cause
is a "fluid concept" that is "not readily, or even usefully,
reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S.
213, 232 (1983). It "requires only a probability or substantial
chance of criminal activity, not an actual showing of such
activity." Id. at 243-44. In other words, probable cause "is not
a high bar." Kaley v. United States, 571 U.S. 320, 338 (2014). The
Government bears the burden of establishing probable cause. *See*
United States v. Bizier, 111 F.3d 214, 217 (1st Cir. 1997)
(citations omitted). The probable cause established for an arrest
and a search incident to that arrest can be for an offense
different than the crime that is ultimately charged and prosecuted.
*See* id. at 218.

       The Court agrees with the Government that there was probable
cause to arrest Defendants at Las Picuas. As TFA Nieves drove down
Road No. 3, Defendants were tailing his Jeep Wrangler to such a
degree that TFA Nieves felt compelled to warn Officer López.
Defendants then parked the Dodge Caliber in a way that suggested
they were going to try to evade the police and remained in the car

after it stopped instead of getting out to fish or enjoy the beach. Suspected drug trafficking had been reported in the area approximately thirty minutes before law enforcement arrived, and TFA Nieves believed, given his training and experience, that the Dodge Caliber would be used as an escort vehicle to assist in the transportation of any drugs out of Las Picuas. Las Picuas is a known hotspot for drug trafficking and the specific area to which the officers arrived was isolated and not well-suited to leisure activities, particularly given the unfavorable sea conditions that morning— as evidenced by the sunken yola in the bay. Probable cause had accrued by the time law enforcement initiated the <u>Terry</u> stop.

However, even if the officers had not established probable cause by the time Defendants were detained and handcuffed, probable cause was established immediately afterwards when MIA Pérez and TFA Nieves approached the Ford F-150. The Ford F-150 that was thirty feet from the Dodge Caliber, a brief distance that the officers presumably covered on foot within seconds. The officers then discovered that the truck contained multiple large bales in its cabin and truck bed. An outboard engine was on the ground near the truck bed. Based on their training and experience, both men concluded that the bales contained cocaine, with TFA Nieves estimating the bales weighed approximately five hundred kilograms. Both MIA Pérez and TFA Nieves did not believe the drug traffickers using the Ford F-150 would permit unrelated bystanders to be in

the vicinity of the shipment while it was being unloaded and reloaded into the Ford F-150.

Although defense counsel argues, *inter alia*, that the tip from dispatch was uncorroborated and lacked detail, responding officers were unaware of the CBP camera photographs and that Defendants were in dry clothes and did not carry any weapons or contraband on their persons at the time of their arrest, this does not prevent the Government from establishing probable cause. Probable cause does not require an actual showing of criminal activity, only that the responding officers, acting upon apparently trustworthy information, can reasonably conclude that a crime was committed and that the defendants are implicated in its commission. Flores, 888 F.3d at 543; *see* Gates, 462 U.S. at 243-44. Here, Defendants were detained after behaving suspiciously at a location that was remote, unsuitable for leisure activities, and well-known to law enforcement officers for drug trafficking (who were, in turn, responding to a recent report of drug trafficking in that area). They parked near a truck containing bales of what the responding officers understood to be large amounts of cocaine. This was unusual as drug traffickers do not allow unaffiliated bystanders to be in proximity to large drug shipments, leading the officers to suspect that the Dodge Caliber was intended to act as an escort vehicle for the truck.

Probable cause to arrest Defendants thus existed at the time the men were first stopped by law enforcement and ordered out of the Dodge Caliber, strengthened by the discovery of the bales in the Ford F-150. As probable cause existed based solely on Defendants' alleged involvement in drug trafficking, it is unnecessary to reach the immigration issue presented by the Government. Consequently, the Court rejects Defendants' arguments that they were arrested without probable cause.

   C. **<u>Miranda</u> warnings were not required when questioning Defendants at Las Picuas**

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Consequently, before conducting a "custodial interrogation" of a suspect, law enforcement officers must provide <u>Miranda</u> warnings to the suspect as a procedural safeguard for his or her Fifth Amendment rights. *See* <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966). Hence, "the need for a <u>Miranda</u> warning turns on whether a suspect is in custody." <u>United States v. Swan</u>, 842 F.3d 28, 31 (1st Cir. 2016) (internal quotation marks and citation omitted). "Generally, <u>Miranda</u> warnings are not required during mere investigative stops." <u>United States v. Gines-Perez</u>, 214 F.Supp. 2d 205, 220 (D.P.R. 2002) (citation omitted). However, if an individual "is subjected to restraints comparable to those of a formal arrest," he or she must receive a <u>Miranda</u> warning.

   *i.  Defendants were in custody for _Miranda_ purposes*

Courts typically apply a two-part test to determine if a
person is in custody for _Miranda_ purposes. First, "the court
examines the circumstances surrounding the questioning," and
second, "sees whether those circumstances would cause a reasonable
person to have understood his situation to be comparable to a
formal arrest." United States v. Guerrier, 669 F.3d 1, 6 (1st Cir.
2011) (citations omitted). This analysis is guided by various
factors, including but not limited to "where the questioning
occurred, the number of officers, the degree of physical restraint,
and the duration and character of the interrogation." Id. (quoting
United States v. Teemer, 394 F.2d 59, 66 (1st Cir. 2005)).

   After TFA Nieves had finished surveying the Ford F-150, he
returned to where Defendants were handcuffed and seated. He asked
them if they had any identification or phones in their possession.
TFA Nieves then retrieved the men's phones and Dominican
identification cards. (See Docket No. 220-1). Defendants contend
that these questions were incriminating, constituted a custodial
interrogation, and should have been preceded by _Miranda_ warnings.
(Docket No. 131 at 10-12).

   The Court agrees that at this time, Defendants were in police
custody. Defendants were questioned by multiple armed law
enforcement officers while in handcuffs, shortly after being
ordered out of the Dodge Caliber and onto the ground. Even if they

were not formally under arrest, they could not leave the area. Although Defendants were not at a police station or in an interrogation room, they were questioned while sitting on an isolated strip of road, removed from the public. They were only asked four questions over a short period of time, and the types of questions they were asked did not go into their knowledge of any potential drug trafficking in Las Picuas or of the bales inside the Ford F-150. *See* Guerrier, 669 F.3d at 6. Given these circumstances, a reasonable person "would have understood his situation to be comparable to a formal arrest." Id. Defendants were thus in custody for Miranda purposes.

### ii. Defendants were not interrogated for Miranda purposes

The Court now turns to the "interrogation" aspect of Miranda. For Miranda purposes, an interrogation "includes 'any words or actions on the part of the police...that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" United States v. Sanchez, 817 F.3d 38, 44 (1st Cir. 2016) (quoting Rhode Island v. Innis, 446 U.S. 291, 301 (1980)). However, routine booking questions do not constitute an interrogation for which Miranda warnings are required. *See* Trinidad-Nova, 731 F.Supp. 3d at 282 n.3. This includes questions about a suspect's background information, including their "name, address, and related matters." Sanchez, 817 F.3d at 45 (citation and internal quotation marks omitted). The applicability of this

exception is subject to an objective test that asks, "whether the questions and circumstances were such that the officer should have reasonably expected the questions to elicit an incriminating response." Id. (citation and internal quotation marks omitted). While the officer's subjective intent may be considered, it is not conclusive. *See* id.

Here, TFA Nieves' question to Defendants asking them for identification plainly fits within the routine booking exception. *See*, *e.g.*, Trinidad-Nova, 731 F.Supp. 3d at 282 n.3 (affirming the underlying report and recommendation's conclusions that "questions pertaining to place of origin or a valid Puerto Rico identification" are routine booking questions). Likewise, there is no indication that asking Defendants about their phones would incriminate them, and such a question would likely be asked upon booking. The *Motion to Suppress* states that Defendant Reyes was asked if he was in the United States legally. (Docket No. 131 at 11). If this question was asked, it would be reasonably likely to elicit an incriminating response from Defendant Reyes (and Defendant Tirado) and expose them to potential immigration-related charges. Sanchez, 817 F.3d at 44. Any responses to such a question would require suppression. However, testimony from the suppression hearing indicates that Defendants were only asked about their identification and phones, both of which, as discussed above, satisfy the routine booking exception. TFA Nieves' suspicions or

motivation for asking the questions do not create the need for a
<u>Miranda</u> warning *even if* he was attempting to discern if Defendants
were in Puerto Rico legally because his actual questions were
worded in such a way that Defendants were not interrogated.

Although the Defendants were in custody, they were not
subjected to an interrogation at Las Picuas that would have
required <u>Miranda</u> warnings. As such, there was no Fifth Amendment
violation and suppression of their statements in response to
questions about their identification and phones is not required.

As Defendants do not challenge the subsequent waiver of their
<u>Miranda</u> rights in their interviews with SA Ruiz and Officer
Santiago, the Court does not reach this issue and presumes these
waivers to be acknowledged as valid by all parties.

### D. **Defendants lack standing to obtain suppression of evidence obtained during the search of the Dodge Caliber**

As a threshold matter, the person claiming the protection of
the Fourth Amendment must demonstrate a legitimate expectation of
privacy in the area searched or the item seized. *See* <u>Rakas</u>, 439
U.S. at 143. The burden of establishing this expectation of privacy
is often referred to as Fourth Amendment standing, and it is a
burden that falls squarely on the defendant. *See* <u>Rawlings v.
Kentucky</u>, 448 U.S. 98, 105 (1980); <u>Alderman v. United States</u>, 394
U.S. 165, 174 (1969) ("Fourth Amendment rights are personal rights
which...may not be vicariously asserted."). "[T]he defendant must

show both a subjective expectation of privacy and that society accepts that expectation as objectively reasonable." United States v. Mancini, 8 F.3d 104, 107 (1st Cir. 1993). Until the defendant does so, whether a violation of the Fourth Amendment occurred is not legitimately in issue. *See* United States v. Aguirre, 839 F.2d 854, 856 (1st Cir. 1988).

In Aguirre, the First Circuit established a two-tier test to establish the existence of a reasonable expectation of privacy. First, courts must determine "whether or not the individual thought of the place (or the article) as a private one, and treated it as such." Id. at 857. The following factors are relevant to this inquiry:

> ownership, possession, and/or control; historical use of the property searched or the thing seized; ability to regulate access; the totality of the surrounding circumstances; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of such an expectancy under  facts of a given case.

Id. at 856-57. "In the context of a vehicle search, a defendant must show 'a property [or] a possessory interest in the automobile' in order to establish a reasonable expectation of privacy." United States v. Almeida, 748 F.3d 41, 47 (1st Cir. 2014) (quoting United States v. Symonevich, 688 F.3d 12, 19 (1st Cir. 2012)). *See also* Terrence Byrd v. United States, 584 U.S. 395, 400 (2018) ("One who owns and possesses a car...almost always has a reasonable expectation of privacy in it."). While ownership is important, it

is "not dispositive," and courts must consider "the totality of the circumstances." United States v. Gómez-Vega, 519 F.Supp. 2d 241, 256 (D.P.R. 2007) (citations omitted); *see also* Oliver v. United States, 466 U.S. 170, 177 (1984) ("[n]o single factor determines whether an individual" has an expectation of privacy protected by the Fourth Amendment). "[A]ny precautions taken to exclude others or otherwise maintain a privacy interest will heighten the legitimate expectation of privacy in the protected area." Gómez-Vega, 519 F.Supp 2d at 256 (quoting United States v. One 1977 Mercedes Benz, 708 F.2d 444, 449 (9th Cir. 1983)).

If the defendant meets this first step, courts must "then look to whether or not the individual's expectation of confidentiality was justifiable under the attendant circumstances." Id. at 857. The defendant's satisfaction of both steps establishes standing for Fourth Amendment purposes.

> i. *Defendant Reyes did not establish an ownership or possessory interest as an owner of the Dodge Caliber*

During the suppression hearing, Defendant Reyes testified that he had purchased the Dodge Caliber from an unnamed friend for $700.00 in October 2022. He represented he held the only set of keys, parked the car outside his residence at night, did not permit other people to drive it without authorization, and locked the car to secure it. The car was registered in a woman's name, although Defendant Reyes stated he did not register the car in his own name

because it had mechanical issues. He did not obtain insurance for the car and there is no contract or proof of the sale. Defense counsel submitted no emails or messages that reference Defendant Reyes' alleged purchase of the car.

Additionally, in October 2022, Defendant Reyes texted his girlfriend and indicated he had purchased a gray Honda Accord, later taking photographs of that car.[2] The Government argues that Defendant Reyes' decision to purchase the Honda Accord and photograph it after buying it— presumably to show off the new purchase— was because he claimed to have purchased the Dodge Caliber that same month, but never photographed or texted about it. Defendant Reyes also testified on cross-examination that he did not have a car before allegedly purchasing the Dodge Caliber in October 2022, and did not buy another car in October 2022.

Weighing the parties' representations, the Court concludes that Defendant Reyes has not shown that on March 17, 2023, he had a possessory or property interest in the Dodge Caliber that would establish a reasonable expectation of privacy. *See* Almeida, 748 F.3d at 47. Defendant Reyes relied on his testimony to establish an interest in the car, which was self-serving, unsupported by other evidence, vague, and contradictory, at least in relation to

---

[2] The Court notes that a dark-colored Honda Accord was one of the four cars in Las Picuas on March 17, 2023. It is unclear if this car was the same one as that photographed by Defendant Reyes.

his purchase of the Honda Accord. The Court finds the following to be particularly damaging to Defendant Reyes' credibility:

1. Defendant Reyes did not provide the name of the friend from whom he claims to have purchased the Dodge Caliber from.

2. Defendant Reyes has no documents to show he purchased the car.

3. Defendant Reyes did not provide any text messages, e-mails, or any other communication that references him owning or using the Dodge Caliber.

4. Defendant Reyes has no photographs of the Dodge Caliber.

5. Defendant Reyes did not register the car in his name.

6. Defendant Reyes did not obtain insurance for the car.

7. Defendant Reyes did not obtain a *marbete* for the car.

8. The Dodge Caliber is registered with DTOP under another person's name.

9. Defendant Reyes presented no testimony from the alleged seller or his family, friends, neighbors, or other associates who could support his claims of ownership.

10. Defendant Reyes gave contradictory accounts of his purchase of the Honda Accord and of his alleged purchase of the Dodge Caliber.

The Court cannot find that Defendant Reyes holds any type of cognizable possessory interest in the Dodge Caliber. His testimony is full of factual and logical gaps, and the Government's exhibits

indicate another individual was driving and had insured the Dodge Caliber in October 2022, during the window where Defendant Reyes had indicated he purchased the vehicle. Similarly vague and self-serving testimony has previously been insufficient to establish standing for Fourth Amendment purposes in this District. *See* United States v. Morales-Torres, Crim. No. 14-251, 2017 WL 1373329, at *3-6 (D.P.R. Mar. 14, 2017) (under facts strikingly similar to the case at bar, the Court found a defendant lacked standing to challenge items seized from a vehicle when he only provided vague, self-serving testimony to establish ownership of the vehicle), *report and recommendation adopted*, United States v. Morales-Torres, Crim. No. 13-251, 2017 WL 1373867 (D.P.R. Apr. 13, 2017).

> *ii. Defendant Tirado did not establish standing to challenge the search of the Dodge Caliber*

Defendant Tirado fares no better than Defendant Reyes on the issue of standing. The First Circuit has held that "a person who is 'merely a passenger' does not have a reasonable expectation of privacy in a vehicle." Almeida, 748 F.3d at 47. *See also* Rakas, 439 U.S. at 148 (holding that a passenger in a car typically lacks standing to challenge the search of that car). Defendant Tirado presents no other argument that would establish standing to challenge the search of the Dodge Caliber.

As both Defendant Reyes and Defendant Tirado lacked a reasonable expectation of privacy in the Dodge Caliber, they are

unable to challenge the search of the car and cannot seek suppression of evidence obtained during the search.

### E. Defendants Consented to the Search and Seizure of Their Phones

The warrantless search of a cellphone does not violate the Fourth Amendment "when it is properly circumscribed and stands on a voluntary consent given by the person so authorized." United States v. Rivera-Morales, 166 F.Supp. 3d 154, 168 (D.P.R. 2015) (citing United States v. Chaney, 647 F.3d 401, 405-06 (1st Cir. 2003)), *report and recommendation adopted*, United States v. Rivera-Morales, Crim. No. 15-070 (Docket No. 44), *aff'd*, 961 F.3d 1 (1st Cir. 2020). The Government is not required to advise a person giving consent that they have the right to withhold it. *See* United States v. Perez-Montañez, 202 F.3d 434, (1st Cir. 2000) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 234 (1973)). However, the prosecution "must prove valid consent by a preponderance of the evidence." United States v. Forbes, 181 F.3d 1, 5 (1st Cir. 1999) (citing United States v. Schaefer, 87 F.3d 562, 569 (1st Cir. 1996)).

Valid consent must be made "knowingly, intelligently, and voluntarily." Rivera-Morales, 166 F.Supp. 3d at 168; *see also* Chhien, 266 F.3d at 7 (voluntary consent must be "an essentially free and unconstrained choice."). This determination is made based on the totality of the circumstances. *See* Forbes, 181 F.3d at 5

(citing Ohio v. Robinette, 519 U.S. 33, 40 (1996) and United States
v. Barnett, 989 F.2d 546, 554-55 (1st Cir. 1993)). Factors that
may be evaluated when determining the presence of valid consent
include "'the consenting party's 'age, education, experience,
intelligence, and knowledge of the right to withhold consent'" and
"whether the consenting party was advised of his or her
constitutional rights and whether permission to search was
obtained by coercive means or under inherently coercive
circumstances." Id. at 5 (quoting Barnett, 989 F.2d at 555). A
person in custody can provide valid consent to a search. See United
States v. Dion, 859 F.3d 114, 130 (1st Cir. 2017) (citation
omitted).

Here, the totality of the circumstances indicates that both
Defendants provided valid consent for the Government to search
their phones after they had been arrested. See Forbes, 181 F.3d at
5. At the time of their detention at Las Picuas, TFA Nieves stated
"they" gave him permission to take their phones, implying both
Defendants agreed to do so. Defendant Reyes signed a consent form
on the morning of March 18, 2023, and Defendant Tirado signed a
consent form on the afternoon of March 17, 2023. (Docket Nos. 179-
1 and 179-2). Both forms are identical and explain, in both Spanish
and English, that the signer is consenting to allow HSI agents
their cell phones. Id. The forms state that the signer can refuse
to consent to the search or to sign the form, and the signer was

not promised, threatened, forced, or subjected to mental or physical coercion to get them to consent to the search. Id. Each of the Defendants wrote out his name and signed and dated the forms. Id.

When Defendant Reyes signed the consent form, he was in a processing area with Officer Santiago and a colleague, both of whom were unarmed. Officer Santiago broached the topic of the consent form while sitting next to Defendant Reyes on a bench, taking a nonthreatening stance. She showed Defendant Reyes a cell phone, which he confirmed was his. She then explained that signing the consent form would allow the authorities to search Defendant Reyes' phone. Defendant Reyes nodded before verbally acknowledging her statement and confirmed that he could read and write. Officer Santiago read Defendant Reyes the Spanish version of the form, and he confirmed he understood the form before filling out and signing it. He did not show fear, confusion, coercion, or any sign that he did not understand the form or wished to consult with an attorney. Defendant Reyes had waived his Miranda rights the previous day and Officer Santiago did not provide Miranda warnings, but this is ultimately irrelevant because this meeting with Officer Santiago was focused on seeking Defendant Reyes' consent to the search of his phone. It was not a custodial interrogation to which Miranda warnings were required. See United States v. Costoso, 56 F.Supp. 3d 104, 112 (D.P.R. 2014) ("Seeking consent to search property,

absent other indicia of a custodial interrogation, does not require Miranda warnings.") (citation omitted).

Defendant Tirado's decision to sign the consent form unfolded similarly. SA Ruiz and another colleague, both unarmed, interviewed Defendant Tirado while the men were sitting across from each other at a table. The interview was conducted in SA Ruiz's office in an area specifically designed for interviews. During the interview, SA Ruiz confirmed that Defendant Tirado could read and write. Defendant Tirado had signed a form waiving his Miranda rights near the beginning of the interview and, based on SA Ruiz's testimony, before the topic of his cell phone was raised. Defendant Tirado told SA Ruiz that his cell phone had been confiscated by the police and that he gave police permission to look at the phone. SA Ruiz asked Defendant Tirado if he still provided consent for the police to look at his cell phone, and Defendant Tirado answered yes. During the interview, Defendant Tirado verbally consented for the Government to search his phone at least three times. SA Ruiz provided Defendant Tirado with the same type of consent form signed by Defendant Reyes. SA Ruiz read and explained the form to Defendant Tirado in Spanish, highlighting key points of the form to ensure Defendant Tirado fully understood what he was signing and did so freely and voluntarily. SA Ruiz then filled out the consent form and gave it to Defendant Tirado for him to sign.

Defendants' arguments against the validity of their consent fall flat. Defendant Reyes' main objection is that he was not advised of his <u>Miranda</u> rights before he signed the consent form, which is contradicted by testimony from the suppression hearing. (Docket No. 131 at 14). Defendant Tirado argues more broadly that any consent he provided was involuntary, and the Government has not proven valid consent was given by a preponderance of the evidence. (Docket No. 252 at 9). These arguments are unpersuasive in light of the strong evidence showing Defendants consented to searches of their phones.

While Defendants were in custody, an individual in custody can consent to a search. *See* <u>Dion</u>, 859 F.3d 114, 130. Defendants signed the consent forms after the contents and implications of the forms were explained to them. They were not confronted by armed government agents. There is no sign they were coerced, enticed, or otherwise manipulated into signing the forms, or that they did not realize what they were agreeing to by signing the forms. Indeed, Defendant Tirado appears to have volunteered his consent no less than three separate times in his HSI interview. The testimony at the suppression hearing all indicates that Defendants consented to the searches of their cell phones "knowingly, intelligently, and voluntarily." <u>Rivera-Morales</u>, 166 F.Supp. 3d at 168. Defendants' self-serving statements do not defeat the Government's showing, by a preponderance of the evidence, that both men provided valid

consent for law enforcement to search their cell phones. *See* Forbes, 181 F.3d at 5.

### F. Supervisory MIA Schneeberger's testimony on the canine search was appropriate

Defendants argue that the canine search of the Dodge Caliber was unlawful as there was no investigatory stop to begin with. (Docket No. 131 at 2). However, this argument was "too undeveloped to state a legal contention" and is thus waived. United States v. Leland, Crim. No. 03-033, 2015 WL 1809663, at *36 (D. Me. Apr. 21, 2015); *see also* United States v. Gonsalves, 859 F.3d 95, 112 n.7 (1st Cir. 2017) ("undeveloped arguments are waived") (citing United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990)).

Defendant Reyes' *Post-Hearing Supplemental Briefing on Motion to Suppress* raises a different argument about the canine search, arguing that part of Supervisory MIA Schneeberger's testimony should be disregarded as lacking credibility because he stated that seeing a police dog sit next to the Dodge Caliber indicated, in his experience, that the dog was alerting to the scent of narcotics. (Docket No. 253 at 21). However, "[t]he Supreme Court has stated that 'a law enforcement officer may rely on his training and experience to draw inferences and make deductions that might well elude an untrained person.'" United States v. Johnston, 784 F.2d 416, n.4 (1st Cir. 1986) (citing Texas v. Brown, 460 U.S. 730, 746 (1983) (Powell, J., concurring)).

At the suppression hearing, Supervisory MIA Schneeberger testified that he has been involved in hundreds of drug cases, a significant majority of which involved a canine. His testimony was not definitively stating that there were traces of narcotics in the Dodge Caliber. He did not present himself as an authority on canine searches. Instead, he testified as to the inference he drew watching the dog's behavior based on his training and experience in law enforcement, particularly in cases involving drugs. This is well within the bounds of appropriate testimony, and the Court sees no reason to disregard Supervisory MIA Schneeberger's testimony.

## V.    CONCLUSION

In consideration of the above findings, the Court **DENIES** the *Motion to Suppress* at Docket No. 131.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 3rd day of October 2025.

S/RAÚL M. ARIAS-MARXUACH
UNITED STATES DISTRICT JUDGE